U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG 2 9 2016

TONY R. MOORE  CLERK
BY _____
            DEPUTY

UNITED STATES DISTRICT COURT                    b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

ANTHONY F. ELIE                    CIVIL ACTION NO. 1:15-CV-01661

VERSUS                             JUDGE TRIMBLE

U.S. COMMISSIONER OF               MAGISTRATE JUDGE PEREZ-MONTES
SOCIAL SECURITY
ADMINISTRATION

---

## REPORT AND RECOMMENDATION

Anthony F. Elie ("Elie") filed an application for supplemental security income ("SSI") and disability insurance benefits ("DIB") that was denied by the Social Security Administration ("SSA") on October 29, 2009 (Doc. 3-1, p. 188/428). Apparently, Elie did not appeal that decision.

Elie filed a second application, on June 7, 2010, for a period of disability and DIB (Doc. 3-1, p. 288/428). Elie alleged a disability onset date of March 15, 2009 due to "heart problems, feet, shoulders" (Doc. 3-1, pp. 288, 347/428). That claim was denied by the SSA on October 7, 2010 (Doc. 3-1, p. 196/428).

A de novo hearing was held on May 4, 2011, at which Elie was present with his attorney and a vocational expert ("VE") (Doc. 3-1, p. 103/428). The ALJ found that Elie has severe impairments of foot pain, heart problems, and degenerative joint disease ("DJD") of the left shoulder, but has the residual functional capacity to perform sedentary work, except that he is limited to no overhead reaching with the left (non-dominant) upper extremity, and can only lift up to ten pounds occasionally or frequently (Doc. 3-1, p. 174/428). The ALJ concluded that Elie is unable to perform

his past relevant work as a security guard and a home health aide (Doc. 3-1, p. 178/428), but that he can work as a timekeeper, a telephone solicitor, and a surveillance system monitor and, therefore, was not disabled from March 15, 2009 through the date of his decision on May 23, 2011 (Doc. 3-1, p. 179-428).

Elie requested a review of the ALJ's decision.  The Appeals Council remanded Elie's case to the ALJ with instructions to consider new evidence (medical records from the VAMC) and obtain any additional evidence necessary (Doc. 3-1, pp. 184-85/428).

A second de novo hearing was held on June 27, 2013, at which Elie appeared with a VE (Doc. 3-1, p. 128/428).   The ALJ found that, although Elie suffers from severe impairments of arrhythmias, degenerative joint disease of the left shoulder, foot pain, and depression, he has the residual function capacity to perform sedentary work except that he is limited to no reaching overhead with the left (non-dominant) upper extremity, and that, due to depression, he is limited to simple, routine, repetitive tasks with one- to two-step instructions, a work environment that is free of any fast-paced production requirements, and few, if any, work place changes (Doc. 1-3, pp. 89-92/428)

The ALJ concluded that Elie cannot perform his past relevant work as a security guard, but that he can work as an assembler or a hand-packer, and that he was not disabled as defined in the Social Security Act at any time from March 15, 2009 through the date of his decision on July 16, 2013 (Doc. 3-1, pp. 96-98/48).

The Appeals Council denied Elie's request for review (Doc. 3-1, p. 6/428) and concluded the 2014 VAMC records were not relevant to the current claim, but could form the basis of a new claim.  The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Elie next filed this appeal for judicial review of the Commissioner's final decision.  Elie raises the following issues for appellate review (Doc. 7):

1. The ALJ ignored and failed to address the VA disability rating of 70% service-connected and impaired hearing problem.

2. The ALJ ignored and failed to address the diagnosis of cuboid syndrome of both feet, that impairs Elie's ability to ambulate, and Listing 1.00(2)(B)(1, 2).

3. The ALJ ignored and failed to address the side effects of Elie's medication on his ability to work.

4. The ALJ relied on an outdated function report that was completed by Elie in 2010, nearly three years prior to the hearing, and ignored the current medical records and Elie's testimony at the hearing.

Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be disabled as defined by the Social Security Act.  See 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than 12 months.  See 42 U.S.C. § 423(d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously

performed or in any other substantial gainful employment that exists in the national economy. See 42 U.S.C. 423(d)(2).

Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision, and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that

4

are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

Summary of Pertinent Facts

1. Records

Elie was 45 years old when he applied for disability benefits in June 2010 (Doc. 3-1, p. 280/428). Elie has a high school education and past relevant work as a school custodian (1994-2002), a driver for a church (1998-present), a security guard (1997-2009), and a sitter (2008-2010) (Doc 3-1, p. 348/428). Elie was also in the Louisiana National Guard (1984-1985), was a maintenance and security officer at a mall (1986-1992), a supervisor at Handi Work Productions (1993-1994), worked at Sears from 1996-2003, and was a mental health technician (2003-2005) (Doc. 3-1, p. 366/428).

In February 2008, Elie reported weakness, hypotension, diaphoresis, and irregular heart beat (Doc. 3-2, p. 109/538). Elie was diagnosed with atrial fibrillation, tachycardia, palpitations, and weakness (Doc. 3-2, p. 115/538).

In March 2009, Elie had an abnormal ECG (Doc. 3-2, p. 5/538). The final report showed the left atrium was mildly dilated, LVH (left ventricular hypertrophy) moderately severe, and mild-to-moderate regurgitation of the pulmonic valve (Doc. 3-2, p. 52/538).

In April 2009, Elie complained of ankle pain (Doc. 3-2, p. 99-100/538). Elie had edema without effusion, a full range of motion, and tenderness, and arthralgia and osteoarthritis were diagnosed (Doc. 3-2, pp. 102-3/538). Left foot and ankle x-rays in May 2009 showed anterior talar beaking near the talonavicular joint, pes planus, and some degenerative change in the first metatarsophalangeal ("MTP") joint, but predominantly normal alignment (Doc. 3-2, p. 3/538). Elie's left ankle was normal (Doc. 3-2, p. 4/538). In June 2009, Elie complained of left ankle pain and swelling for one month, gout was ruled out, and Elie was diagnosed with Achilles bursitis/tendonitis in his left ankle (Doc. 3-2, pp. 75-76, 90-93/538). Elie was prescribed crutches, an ace wrap, depomedrol, and toradol (Doc. 3-2, pp. 75-76/538).

In September 2009, Elie went to the ER for complaints of pain in both ankles and that his right ankle had given out and rolled over (Doc. 3-2, p. 30/538). Elie was diagnosed with ankle sprain/strain and pain in his ankle joints (Doc. 3-2, p. 31/538). An MRI of the left ankle in October 2009 showed a cystic-appearing lesion with surrounding bone marrow edema, minimal tenosynovitis of three tendons, and minimal subcutaneous edema (Doc. 3-2, pp. 48-9/538).

In October 2009, Elie was evaluated by Dr. Daniel Denison, on behalf of Louisiana Disability Determination Services, for heart problems, feet problems, and a left shoulder problem (Doc. 3-2, p. 13/538). Elie was 5'5" tall, weighed 200 pounds, and his blood pressure was 140/79 (Doc. 3-2, p. 14/538). Elie ambulated without difficulty, his gait was normal, his spine was non-tender, he did not have paraspinal muscle tenderness, and he did not need an assistive device, but he had tenderness of

the right foot at the heel and of the left lateral malleolus (Doc. 3-2, p. 15/538).   Elie
had a normal range of motion of the spine, hips, knees, ankles, and right shoulder,
but his left shoulder had a decreased range of motion with a popping noise on rotation
(Doc. 3-2, p. 15/538).  Elie had negative straight leg raising, could walk on his heels
and toes, could do heel-to-toe ambulation, and could squat (Doc. 3-2, p. 15/538).  An
x-ray showed a screw in the head of Elie's left shoulder in which the tip was broken
off and embedded in the soft tissue near the joint space, but no arthritic changes (Doc.
3-2, p. 15/538).   Dr. Denison noted that Elie stated he has heart problems due to
occasional chest pain with palpitations (noncharacteristic of angina), bilateral foot
pain, and left shoulder pain with decreased range of motion and a mild functional
limitation (Doc. 3-2, p. 16/538).

In February 2010, Elie underwent a pre-hire physical evaluation (Doc. 3-2, p.
151/538).   The evaluation noted that Elie has difficulty reaching overhead, but
concluded he could work with no accommodations (Doc. 3-2, p. 151/538).

In August 2010, Elie had another disability services evaluation by Dr. Ajay K.
Ravi (Doc. 3-2, p. 56/538).  Dr. Ravi stated that an MRI of the left foot would be helpful
to determine why Elie complained of being unable to bear weight and walk on his left
foot (noting an MRI had been done of the left ankle but not the foot) (Doc. 3-2, p.
58/538).  Dr. Ravi found that Elie had a normal sinus rhythm on his EKG and a
regular pulse that day, so his atrial fibrillation could be caused by being on diltiazem
medication (Doc. 3-2, p. 58/538).  Dr. Ravi concluded that, based on the evidence, Eli
could sit, walk, and/or stand for a full workday, lift/carry without limitations, carry

out and remember instructions, hold a conversation, and respond appropriately to questions (Doc. 3-2, p. 58/538).

In March 2011, Elie's echocardiography report had normal results except the left atrium was mildly dilated, there was mild thickening of the left ventricular walls, and there was mild regurgitation of the pulmonic valve (Doc. 3-2, p. 138/538).

Elie underwent a nuclear stress test in April 2011 due to his complaints of angina pain (Doc. 3-2, pp. 62, 64/538). Elie had chest pain on exertion (Doc. 3-2, pp. 215/538), but his stress echo test was normal (Doc. 3-2, pp. 217, 220/538), and he had a normal sinus rhythm (Doc. 302, p. 221/538).

Elie was admitted to the VAMC psychiatry service due to suicidal thoughts, from May 13, 2011 to May 27, 2011 (Doc. 3-2, pp. 153-54/538). On admission, it was noted that Elie was 5'6" tall and weighed 172 pounds (Doc. 3-2, p. 201/538). On discharge, Elie was diagnosed with mood disorder secondary to his general medical condition at Axis I; personality disorder NOS at Axis II; hypertension, GERD, coronary artery disease at Axis III; unemployment, financial problems (home in foreclosure), and "fight with disability" at Axis IV; and a current GAF of 60 at Axis V (Doc. 3-2, p. 154/538).[1]

---

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning

An MRI of Elie's left ankle in July 2011 showed possible calcaneonaviclar coalition with abnormal stress of the anterior processs of the calcaneus with a possible stress fracture, and severe degenerative changes in the posterior talo calcaneal facet joint (Doc. 3-2, p. 235/538).   Moderately severe edema was present (Doc. 3-2, p. 234/538).   X-rays of Elie's knees in July 2011 were normal (Doc. 3-2, pp. 235-36 /538).

In August 2011, Elie was diagnosed with congenital pes planus and he was casted for bilateral custom foot orthotics (Doc. 3/2, p. 270/538).   Elie was also diagnosed with left ankle fracture, DJD, and referred for ankle braces, custom molded inserts, and orthopedic shoes, and was advised to limit ambulation (Doc. 302, p.

---

level.  The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year.  See DSM-IV-TR at 32-34.  The GAF scale goes from 0-100: **91-100** - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; **81-90** - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; **71-80** - if symptoms are present, they are transient and expectable reactions to psycho-social stressors,  not more than slight impairment in social, occupational, or school functioning; **61-70** - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; **51-60** - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; **41-50** - serious symptoms OR serious impairment with social, occupational, or school functioning; **31-40** - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; **21-30** - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; **11-20** - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; **1-10** - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and **0** - inadequate information.  See DSM-IV-TR, at 34; see also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

283/538).   Elie received his orthotics in November 2011 (Doc. 3-2, pp. 398, 415-16/538).

In September 2011 and October 2011, Elie was evaluated in the mental health clinic and diagnosed with major depressive disorder and mood disorder secondary to chronic pain at Axis I; medical issues, mental health issues, unemployment, and financial stress at Axis IV; and a GAF of 60 at Axis V (Doc. 302, p. 403/538). Elie was found to have an occupational and social impairment with reduced reliability and productivity (Doc. 3-2, p. 417/538). Elie's symptoms were depressed mood, anxiety, a chronic sleep impairment, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, and suicidal ideation (Doc. 3-2, pp. 419-420/538).

In October 2011, Elie complained of bilateral knee pain, worse on the right (Doc. 3-2, p. 266/538). Elie complained of his left knee giving away and right knee pain, and his pain was mostly with standing and improved after moving some (Doc. 3-2, p. 266/538). Elie had patellar crepitus with no instability or effusion in either knee, a full range of motion in both knees, no tenderness in the right knee, but tenderness in the left knee (Doc. 3-2, p. 266/538). Elie was diagnosed with knee pain with probably internal derangement, was offered (but refused) injections, and was advised to try quad strengthening exercises (Doc. 3-2, p. 266/538).

In December 2011, X-rays of Elie's right foot showed mild degenerative joint disease at the first MTP joint (Doc. 3-2, p. 232-33/538).

X-rays of Elie's left shoulder in April 2012 (after a car accident) showed postoperative changes with screws and wires, and calcific tendinosis of the rotator cuff (Doc. 3-2, p. 231/538). However, there was no significant abnormality (Doc. 3-2, p. 372).

In May 2012, Elie was treated for chronic pain (Lortab, Mobic, Capsaicin cream), hypertension (stable on medication), GERD (stable on Zantac), and anemia (given iron pills), and was instructed about a cardiac diet (Doc. 3-2, p. 341/538).

In June 2012, Elie reported constant pain in his feet, ankles, knees and hips, since 1985, worse when standing or switching from laying to sitting (Doc. 3-2, p. 334/538). Elie reported that ice and laying down relieved his pain (Doc. 3-2, p. 335/538). The Morse Fall scale indicated Elie was at a high risk for falls, and he reported falling in the last three months (Doc. 302, p. 335/538). Elie was assessed with chronic pain that caused irritability and insomnia (Doc. 3-2. [/ 336/538).

In June 2012, Elie was diagnosed in the mental health clinic with: major depression disorder and mood disorder secondary to "GMC" (chronic pain) at Axis I; medical issues, mental health issues, unemployed, and financial stress at Axis IV; and a GAF of 60 at Axis V (Doc. 3/2, p. 331/538),

In July 2012, Elie was treated at the VAMC Podiatry Clinic for his pes planus (bilaterally) and mild DJD at the first MTP joint (Doc. 3-2, pp. 259-60/538). In September 2012, X-rays showed spurring at the left first MTP joint, with diminished joint space noted and spurring at both ankles with talar beaking (Doc. 3/2, p. 527/538). Elie was diagnosed with pes planus with plantar fasciitis (worse on the

right), hallux limitus left, edema bilaterally in the lower extremities, and talar beaking (Doc. 3-2, p. 527/538).

In 2013, Elie was prescribed compression stockings (Doc. 3-2, pp. 247-50/538). In March 2013, Elie was also prescribed ankle braces and shoe inserts, but Elie only wanted the ankle braces and complained that his ankles hurt all the time (Doc. 302, p. 271/538).

Also in March 2013, a mental evaluation that showed Elie had: depressive disorder NOS, anxiety disorder NOS, and insomnia secondary to another mental disorder at Axis I; chronic medical illnesses at Axis IV; and a GAF of 70 at Axis V (Doc. 3-2, p. 296/538). Elie was prescribed sertraline for depression/anxiety, double mirtazapine for depression/anxiety, and double zolpidem for insomnia (Doc. 3-2, p. 296/538).

In April 2013, Elie was treated for chronic bilateral feet/ankles/toe pain (Doc. 302, p. 290-91/538). Elie's legs gave way, and he fell and sprained his right thumb (Doc. 3-2, p. 289, 292/538).

In June 2013, Elie was evaluated for VA disability benefits due to his ankle conditions (Doc. 302, p. 347/538). Elie was found to have DJD in the left ankle, cuboid syndrome in both ankles,[2] and chronic ankle strain in the right ankle (Doc. 3-2, p. 347/538). In both ankles, Elie had less movement than normal, weakened movement,

---

[2] Elie was diagnosed with navicular cuboidal bar right foot and calcaneal cuboidal bar left foot in 1985, resulting in painful arches and intense pain the feet. Cuboid syndrome is characterized by pain and weakness of the lateral foot and with continued aggravation and exacerbation, eventually affects the entire foot as well as the ankles, and affects ambulation and mobility (Doc. 3-2, p. 367/538). Cuboid syndrome can continue to worsen until it extends into the entire lower limbs, eventually affecting almost the entire skeletal system (Doc. 3-2, p. 367/538).

pain on movement, disturbance of locomotion, and interference with sitting, standing and weight bearing, as well as swelling in the left ankle (Doc. 3-2, pp. 350-351/538). Elie also had localized tenderness or pain in both ankle joints (Doc. 3/2, p. 351/538). Elie's ankle muscle strength was 0/5 (no muscle movement) on dorsiflexion of his left ankle (Doc. 3/2, p. 351/538). Elie was found to use a wheelchair occasionally, crutches regularly, a cane constantly, and orthotics constantly for his bilateral ankle and foot conditions (Doc. 3-2, p. 355/538).   Imaging studies indicated that Elie has degenerative (probably traumatic) arthritis in the left ankle (Doc. 3-2, pp. 356-57/538).

Elie's bilateral ankle condition causes functional impairments that affect physical employment activities, such as carrying, lifting, ambulation, and standing, and his sedentary activities are affected by the use of narcotic pain medication (Doc. 3-2, p. 365/538). Elie was also diagnosed with metatarsalgia (bilaterally) and DJD of the first MTP joint, and his condition was found to have worsened and was affecting his ambulation (Doc. 3-2, p. 358/538).

In September 2013, the Elie reported to the podiatry clinic that both feet were painful, more on the right at the heel and on the left at the first MTP joint (Doc. 3-2, p. 524/538). Elie was assessed with pes planus with plantar fasciitis (worse on the left), hallux limitus on the left, and edema bilaterally in the lower extremities (Doc. 3-2, p. 524/538). Elie stated that he preferred conservative treatment to surgery, so high top boots and compression stocking were ordered (Doc. 3-2, p. 525/538). Elie was

13

also given injections of lidocaine and kenalog to both heels, and he reported immediate relief (Doc. 3-2, p. 525/538).

2. 2013 Administrative Hearing

At his June 2013 administrative hearing, Elie testified that he was 47 years old, 5'6" tall, weighed about 200 pounds, is right-handed, and can drive some (Doc. 3-1, p. 131/428). Elie testified that he is taking Meloxicam for arthritis, medication for muscle spasms, something for his stomach, aspirin, and nitroglycerin for chest pain (Doc. 3-1, p. 131/428). Elie testified that his medications make him sleepy and dizzy, and sometimes cause irregular bowel movements (Doc. 3-1, p. 131/428).

Elie testified that he has cuboid syndrome in both feet and that it is not correctable (Doc. 3-1, p. 131/428). Elie uses a cane, crutches, and a wheelchair (Doc. 3-1, p. 131/428). Elie explained that he uses the wheelchair at the VAMC (Doc. 3-1, p. 146/428).

Elie further testified that he takes dioxizin, aspirin, and nitroglycerin for his heart (Doc. 3-1, p. 132/428). Elie testified that he has chest pain sometimes and shortness of breath on exertion (Doc. 3-1, p. 132/428). Elie testified that his doctors have discussed putting in stents (Doc. 3-1, p. 132/428).

Elie testified that he has problems reaching overhead with his left arm (Doc. 3-1, p. 132-33/428). Elie has had two surgeries on his shoulder, including a bone graft (Doc. 3-1, p. 133/428).

Elie takes Lorazepam and Zoloft for depression and anxiety, and that he sees a doctor (Doc. 3-1, p. 134/428).  He has stayed two weeks in the VA hospital for treatment of his depression (Doc. 3-2, p. 134/428).

Elie testified that his wife helps him get in and out of the tub, and he does not do household chores (Doc. 3-2, pp. 134-35/428).  He graduated from high school and took some college classes (Doc. 3-1, p. 135/428).

Elie drives the church van for about thirty minutes on Sundays, for which he is paid $150 each month (Doc. 3-1, pp. 135, 144/428).  Elie testified that he last worked for about three years, from about 2006 to 2009, as a security officer/custodian at Huey P. Long Hospital (Doc. 3-1, pp. 135-36/428).  Elie also worked for about a year as a sitter with autistic children (Doc. 3-1, p. 136/428) and was a Sheriff's deputy for twelve years (Doc. 3-1, p. 139/428).  As a deputy, Elie would make rounds, check on the elderly, work in the jail, work at functions such as drives and trade days, and "work emergencies" (Doc. 3-1, p. 139/428).  He has never had a desk job and has never supervised anyone (Doc. 3-1, p. 144-428).

Elie wears prescribed foot braces (for his toes), ankle braces, a knee brace, and a back brace every day (Doc. 3-1, pp. 136-137/428).   Elie also wears prescribed compression stockings every other day (Doc. 3-1, p. 137/428).  Elie has a 70 percent service-connected disability (Doc. 3-1, pp. 137-38/428).  Elie also wears hearing aids in both ears for partial deafness (that is also service-connected) (Doc. 3-1, p. 138/428). Elie testified that the podiatrist prescribed him boots, but he has not been able to wear them because his toes hurt so badly (Doc. 3-1, p. 139/428).

Elie puts ice on his feet to numb them, and he has to sit and lay down periodically every day to elevate his feet (Doc. 3-1, p. 140/428). Elie can walk down a hallway, but it is not easy (Doc. 3-1, p. 141/428). He cannot lift more than ten pounds with his left arm and cannot raise his left arm all the way up (Doc. 3-1, p. 142/428).

Elie testified that he takes two hydrocodone pills a day (Doc. 3-1, p. 142/428). The hydrocodone makes Elie nauseated, dizzy, and sleepy (Doc. 3-1, p. 142/428).

Bad weather causes pain in his left big toe due to arthritis (Doc. 3-1, pp. 142-43/428). Elie also has arthritis in his knees and back (Doc. 3-1, p. 143/428). Elie's feet make him fall (Doc. 301, p. 143/428). Elie testified that he has difficulty walking, he can stand ten to fifteen minutes, he has to keep changing positions when he sits due to discomfort, and laying down relieves his pain (Doc. 3-1, pp. 143-44/428). He only drives the church van for 30 minutes, and he would not be able to drive from Baton Rouge to New Orleans because he cannot sit for that long and would have to stop at lot to change positions (Doc, 3-1. p. 145/428). Elie also has trouble getting in and out of a car (Doc. 3-1, p. 145/428). Elie testified that he hurts when he stands, but he is better off standing than sitting because he has trouble getting up and down (Doc. 3-1, p. 146/42). Elie testified that he has had physical therapy but it was not successful (Doc. 3-1, p. 146/428).

Elie testified that, during the day, he watches TV, rests, and sleeps (Doc. 3-1, p. 146/428). His pain causes him to be frustrated with his inability to do things for himself (Doc. 3-1, p. 146/428).

The VE testified that Elie's job as a school custodian (1994-202) was medium work, SPV 3, semi-skilled (DOT 382l664-010); his work as a security guard (1997-2009) was light work, SPV 3, semi-skilled (DOT 372.667-038); his work as a personal attendant (2008-2010) was light work, SVP 3, semi-skilled (DOT 309.674-014); and his work as a church driver (1998-present) is medium work, SVP 3, semi-skilled (DOT 913.663-010).

The ALJ posed a hypothetical involving an individual with the same age, education, and work experience as Elie, with limitations of light work,[3] stand/walk or sit for up to six hours in an eight hour day with normal breaks, no reaching or overhead reaching with the left (non-dominant) extremity, and only simple, routine, repetitive work, with one or two-step instructions, in a work environment that is free of any fast-paced production requirements, involving only simple work-related decisions, and few, if any, work place changes (Doc. 3-1, pp. 149-50/428). The VE responded that such an individual would not be able to do any of Elie's past work (Doc. 3-1. P. 150/428). The VE further responded that such an individual would be able to work in rental car delivery (DOT 317.567-010) (light, SVP 2, unskilled work, 2,123 jobs in Louisiana, 148,212 jobs in the United States); bottle line attendant (DOT 920.687-018) (sedentary, unskilled work, 796 jobs in Louisiana and 3,886 jobs in the

---

[3] "Light work" is defined in 20 C.F.R. § 404.1567(b) and § 416.967(c) as follows:
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

United States); or a light work bottle line attendant (5654 jobs in Louisiana, 303,091 jobs in the United States).

The ALJ posed a second hypothetical involving an individual of Elie's age, education, and work experience, who is limited to sedentary work,[4] can stand/walk up to two hours and sit for up to six hours in an eight hour day with normal breaks, no reaching or overhead reaching with the left (non-dominant) extremity, and only simple, routine, repetitive work (Doc. 3-1, p. 151/428). The VE responded that such an individual could work as a fishing reel assembler (DOT 732.684-062) (sedentary, SVP 2, unskilled work, 1027 jobs in Louisiana and 181,099 jobs in the United States), or a hand packer (DOT 920-687-018) (sedentary, 790 jobs in Louisiana, 3,886 in the United States).

The VE explained that the hand packer job can be sedentary work, and that the rental car delivery and bottle line attendant jobs require ambulation at the light work level (Doc. 3-1, pp. 152-52/428). The VE further explained that a rental car deliverer is seated most of the time but is light work (Doc. 3-1, p. 153/428). Rental car deliverers and bottle line attendants are required to ambulate, stand, and get in and out of cars at the light work level (Doc. 3-1, p. 153/428). The VE testified that unscheduled breaks to lay down due to pain would not be tolerated, nor would absences (Doc. 3-1. p. 153/428). The VE also testified that anyone taking three or

---

4 The Social Security regulations define "sedentary work" in §404.1567(a) as follows:
Sedentary work involves lifting no more than 10 pounds  at a time and occasionally lifting or carrying articles  like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties.  Jobs are sedentary  if walking and standing are required occasionally and other sedentary criteria are met.

four hydrocodone tablets in a workday would not be able to attend to the task at hand (Doc. 3-1, p. 154/428).

The ALJ posed a third hypothetical involving an individual of Elie's age, education, and work experience, who can stand or walk only a few minutes during a workday, and cannot sit for a total six hours in an eight hour day (Doc. 3-1, p. 152/428). The VE testified there are no jobs such an individual can do (Doc. 3-1, p. 152/428).

ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Elie (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is

satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Elie has not engaged in substantial gainful activity since March 15, 2009,[5] that his disability insured status expired after September 30, 2013, and that he has severe impairments of arrhythmias, degenerative joint disease of the left shoulder, foot pain, and depression, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 3-1, p. 89/428). The ALJ also found that Elie is unable to perform his past relevant work (Doc. 3-1, p. 96/428).

At Step No. 5 of the sequential process, the ALJ further found that Elie has the residual functional capacity to perform the sedentary work except that he is limited to standing/walking up to two hours or sitting up to six hours in an eight-hour day, lifting only ten pounds occasionally, cannot reach overhead with the left (non-dominant) upper extremity, and is limited to simple, routine, repetitive tasks with one- to two-step instructions, a work environment free of any fast-paced production requirements, and few, if any, work place changes (Doc. 3-1, p. 92/428).

The ALJ also found that Eli is a younger individual (45-49) with at least a high school education, and that transferability of job skills is not material (Doc. 3-1, p. 96/428). The ALJ concluded there are a significant number of jobs in the national economy that Elie can perform, such as assembler and hand packer and, therefore,

---

[5] The ALJ found that driving the church van is below the substantial gainful activity level (Doc. 3-1, p. 89/428). See 20 C.F.R. § 404.1510; 20 C.F.R. § 404.1572.

Elie was not disabled as defined in the Social Security Act at any time through the date of the ALJ's decision on July 16, 2013 (Doc. 3-1, pp. 96-98/428).

Law and Analysis

1. Grounds 1 & 2 – VA Disability Rating and Cuboid Syndrome

First, Elie contends the ALJ ignored and failed to address the VA disability rating of 70% service-connected disability and impaired hearing problem.  Elie also contends the ALJ ignored and failed to address the diagnosis of cuboid syndrome of both feet which impairs Elie's ability to ambulate, and Listing 1.00(2)(B)(1, 2).[6]

A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ.  See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001).  In Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir.1981), and its progeny, the Fifth Circuit stated that a VA disability determination is entitled to "great weight."  In Chambliss, the Fifth Circuit explained that, while this is true in most cases, the relative weight to be given this type of evidence will vary depending upon the factual circumstances of each case.  Since the regulations for disability status differ between the SSA and the VA, ALJs need not give "great weight" to a VA disability determination *if* they adequately explain the valid, specific reasons for not doing so.  See Chambliss, 269 F.3d at 522.  The ALJ must consider both the agency's findings and the evidence

---

[6] Listing 1.00 is not a listed impairment in Appendix I.  Instead, Listing 1.00 sets forth the criteria for meeting the listings in the musculoskeletal systems category of impairments (i.e., Listings 1.02, 1.03, 1.04, 1.05, 1.06, 1.07, and 1.08).

underlying them. <u>See</u> <u>Kinash v. Callahan</u>, 129 F.3d 736, 739 (5th Cir. 1997). Failure to do so constitutes reversible error. <u>See</u> <u>Welch v. Barnhart</u>, 337 F.Supp.2d 929, 935 (S.D. Tex. 2004), citing <u>Kinash</u>, 129 F.3d at 739.

The SSA has stated that a disability determination by another governmental agency cannot be ignored and must be considered because it may provide insight into the individual's mental and physical impairments and show the degree of disability determined by these agencies based on their rules. <u>See</u> S.S.R. 06-03p, "Considering Opinions and Other Evidence from Sources Who are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies."

The ALJ completely failed to mention or discuss the VAMC disability rating.[7] That deficiency may be because the ALJ failed to mention any of Elie's medical records from 2012 and 2013. For no apparent reason, the last medical record reviewed by the ALJ was dated August 2011. Since the later medical records concern Elie's feet and include the VA disability rating as well as the diagnosis of cuboid syndrome and the prescriptions for Elie's feet, ankle, knee and back braces, the error is plainly prejudicial.

Moreover, ALJ Robert Grant's 2013 Step 5 analysis (Doc., 3-1, pp. 87-98) is a nearly word-for-word copy of the Step 5 analysis from the 2011 opinion (Doc. 3-1, pp.

---

[7] The ALJ did not consider the 2014 VAMC records and disability rating because they were not part of the administrative record when the ALJ made his July 16, 2013 decision. Elie submitted the 2014 VAMC records referred to the Appeals Council, but the Appeals Council found they did not relate to Elie's earlier claim, and instead formed the basis of a new claim (Doc. 3-1, p.-7/428). However, the VA disability rating was set forth in earlier VAMC records that are part of the administrative record.

172-179).  That fact explains why ALJ Grant failed to mention Elie's 2012 and 2013 medical records.

An administrative law judge has a duty to fully and fairly develop the facts relative to a claim for disability benefits.  See Brock v. Chater, 84 F.3d 726 (5th Cir. 1996); Kane v. Heckler, 731 F.2d 1216 (5th Cir. 1984).  An ALJ is required to "consider all evidence in the case record when [he] makes a determination or decision whether the claimant is disabled," 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).  The Commissioner's (ALJ's) duty to discuss the relevant medical evidence is set forth in 42 U.S.C.A. § 405(b)(1):

> The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter.  Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.

In this case, the ALJ's failure to consider Elie's 2012 and 2013 medical records, as well as his VA disability rating, all of which were part of the administrative record, is a prejudicial legal error.  The unfairness is patent.

Since substantial evidence does not support the ALJ's/Commissioner's finding that Elie is not disabled, their decision is incorrect as a matter of law.  However, this does not entitle Elie to a decision in his favor based upon the existing record.  The record is simply inconclusive as to whether Elie meets a Listing in Appendix I, or whether there are any jobs existing in sufficient numbers in the national economy

that Elie can perform, given his true impairments.  Therefore, Elie's case should be remanded to the Commissioner for further proceedings.

2. <u>Ground 3 - Medication Side Effects</u>

Elie also complains the ALJ failed to consider his medication side-effects and their effect on his ability to work.

The ALJ must consider medication side effects when evaluating a claimant's symptoms.  20 C.F.R. § 404.1529(c)(3)(iv).  In this case, the ALJ failed to mention Elie's medication side-effects in his decision.  Since Elie's is taking hydrocodone daily, as well as several other medications, the failure to consider medication side-effects is legal error.

Therefore, on remand, Elie's medication side-effects should be considered when evaluating his residual functional capacity.

3. <u>Ground 4 – Outdated Function Report</u>

Finally, Elie complains the ALJ relied on an outdated function report from 2010 in determining what activities Elie was able to do in 2013.  Since the ALJ apparently only reviewed the evidence from 2009-2011, reference to a 2010 function report is in keeping with the rest of the ALJ's review.  Since Elie submitted evidence through 2013, the ALJ erred as a matter of law in failing to consider the newer evidence in evaluating his residual functional capacity.

Therefore, Elie's case should be remanded to the Commissioner for further proceedings.

Conclusion

Based on the foregoing, IT IS RECOMMENDED that Elie's appeal be GRANTED, that the final decision of the Commissioner be VACATED, and that Elie's case be REMANDED to the Commissioner for further proceedings, specifically to include review of ALL relevant medical evidence in the administrative record, and to consider the Listing in Appendix I, Elie's diagnosis of cuboid syndrome of both feet, Elie's medication side-effects, and Elie's residual functional capacity in light of the 2012 and 2013 medical records.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have **fourteen (14)** days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14)** days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed.  Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except

upon grounds of plain error.  <u>See</u> <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir. 1996).

    THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _29_ day of August 2016.

                                         Joseph H.L. Perez-Montes
                                         United States Magistrate Judge

s